**Mona BOONE, Plaintiff,**

v.

**LARSON MANUFACTURING COMPANY, INC., a South Dakota Corporation, Defendant.**

**No. CIV.02–4209.**

United States District Court,
D. South Dakota,
Southern Division.

Dec. 2, 2003.

Thomas K. Wilka, Hagen, Wilka and Archer, P.C., Sioux Falls, SD, for Plaintiff.

Timothy M. Welsh, Berens & Tate, Omaha, NE, for Defendant.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

Defendant filed a Motion for Summary Judgment, Doc. 20, in this action brought pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–2(a)(1), prohibiting employment discrimination based upon sex, and 42 U.S.C. § 2000e–3(a), prohibiting an employer from retaliating against an employee for alleging sex discrimination. Plaintiff filed a response in opposition to the motion and Defendant has submitted a reply brief. The Court heard oral argument on the motion on November 24, 2003. The summary judgment motion will be granted as set forth below. Plaintiff's Motion to Extend, Doc. 23, is also pending. The Court will grant the motion because

even considering Plaintiff's responses to the requests for admissions, the Defendant is entitled to summary judgment on all of Plaintiff's claims.

## BACKGROUND

The following are the facts viewed in the light most favorable to the Plaintiff, as the nonmoving party. Plaintiff Mona Boone was employed by the Defendant, Larson Manufacturing Company, Inc., from May 25, 1999 through June 20, 2001. Larson manufactures doors and other products. Boone was first employed with Larson as a dealer line representative, assisting dealers who called in for customer service regarding Larson's products. On May 25, 2000, she was promoted to the position of a Homeowner Line Representative, which requires more product knowledge. Boone's primary responsibilities were to answer customer service calls and complete related paperwork. One of Boone's primary responsibilities was to be available to take calls from customers calling in for assistance. Customer service representatives had the ability to temporarily shut off their phones while they were completing other tasks, such as paper work and obtaining faxes relating to prior calls.

Mary Jensen was Boone's supervisor from the beginning of Boone's employment with Larson until April 27, 2001. A performance evaluation was completed by Jensen for Boone on November 11, 1999, which indicated satisfactory and outstanding performance. Among other things, Jensen noted that Boone had "good availability, few errors" and was "on time, dependable." (Index of Evidence, Doc. 21, Ex. B.) Another performance evaluation was completed by Jensen for Boone on February 14, 2000, indicating satisfactory and outstanding performance. In February 2000, Jensen again noted that Boone had "good availability, stays busy," was

"on time, dependable," and "does whatever is asked stays busy." (Index of Evidence, Doc. 21, Ex. J.) The next evaluation was performed on May 29, 2000, a few days after Boone was promoted to the Homeowner Line Representative position. Jensen noted that Boone was still "on time, good attendance," and that she had taken over the Code of Ethics, and that she was "challenged right now with learning to work on the Home owner line" but Jensen was confident "she will learn the steps needed to succeed." (Index of Evidence, Doc. 21, Ex. O.)

In December 2000, Boone's evaluation indicated she "Needs Improvement" in two areas, Knowledge and Productivity, and that she was performing satisfactorily in the other areas. Contrary to all of her previous evaluations, the December 2000 evaluation did not rate Boone as "Outstanding" in any of the areas evaluated. In the Productivity portion of the evaluation, Jensen wrote "availability and phone volume lower than desired—still working on prioritizing and not getting sidetracked or overwhelmed, this has improved." (Index of Evidence, Doc. 21, Ex. P.) In the Knowledge section, Jensen wrote that Boone was "still learning about the product and how to use procedures efficiently as primarily homeowner representative." (Id.) In the Dependability section of the December 2000 evaluation, Jensen wrote "on time—communicates time off needed. Would like to see Mona punched in with computer and phone on ready to take calls at 7:00 each day." (Id.)

The next written evaluation was completed in March 2001, but was not communicated to Boone until April 10, 2001. The evaluation form used in 2001 is different than the previous evaluation forms. The overall rating given to Boone in the March 2001 evaluation was "Needs Improvement." (Index of Evidence, Doc. 21, Ex.

S.) This evaluation indicated Boone met Larson's expectations in three areas: Communication; Product and Technical Knowledge; and Reliability/Flexibility. It further indicated Boone needed improvement in four areas: Problem Solving and Decision Making; Time Management, Organization, Work Habits; Job Results; and Teamwork, Personal Conduct.

Before Boone received her written evaluation on April 10, 2001, she was informed during a meeting on March 28, 2001 with Jensen and Dixie White, Jensen's supervisor, that she would not be receiving a merit-based raise, for which she was first eligible in March 2001. On March 28, 2001, Jensen and White informed Boone that they were not satisfied with Boone's job performance, specifically that Boone's percentage of the time she was available to take calls was too low. Thus, Boone knew as of March 28, 2001 that she would not be receiving a merit-based raise.

On April 2, 2001, Boone met with Tracey Smith, Larson's Human Resources Manager. Boone informed Smith that Jensen had made two inappropriate comments to Boone, one in December 2000 and one in February 2001. The first comment by Jensen was made in December 2000 near Christmas when Boone was scheduled to work. Larson allowed its customer service representatives to occasionally dress casually when working Holiday shifts. Addressing this casual dress policy, Boone inquired what the dress code would be for the upcoming Holiday shift. Boone entered White's office. Kevin Lathrop and Lisa Kindvall, two supervisors at the same level as Jensen, were sitting in White's office along with White and Jensen when Boone entered. Although Boone directed her question regarding what she could wear on the Holiday shift to White, Jensen said "well, I'd hope you'd wear a bra.... Well, I hope at least you'd wear a bra, because

with those you'd need a bra." (Boone Depo. page 19.) Everyone in the office laughed. Kindvall then made a comment about her own breasts. Feeling uncomfortable, Boone left the office. Boone did not complain to Jensen or any other Larson supervisor that she felt Jensen's statement was offensive or harassing and she did not report this incident to Tracey Smith until April 2, 2001.

The second comment by Jensen to Boone occurred on February 2, 2001. Boone wore a sweater that had a zipper on the front. When Boone was in the fax room, Jensen remarked that Boone had big cleavage. Boone then walked back to her desk, which was surrounded by her co-workers' desks. Jensen continued to draw attention to the size of Boone's breasts and her clothing, by telling others to look at Boone's cleavage. Boone stood up, asked a male co-worker, Steve Kool, if she was dressed inappropriately. When Kool responded that Boone was not dressed inappropriately, Boone said to Jensen "there you have it, I'm dressed appropriately, so leave me alone." (Boone Depo. at 22–23.) Jensen made no further comments to Boone regarding her physical appearance. Boone did not report this comment to any Larson supervisor and she first mentioned it to Smith on April 2, 2001. Boone observed during the April 2, 2001 meeting that Smith did not take written notes regarding Boone's allegations against Jensen.

Smith did not initiate a formal investigation into Jensen's behavior immediately following the April 2, 2001 meeting with Boone. Smith's impression after the meeting was that Boone did not want to file a formal sexual harassment complaint against Jensen pursuant to Larson's Sexual Harassment Reporting Policy. Boone, on the other hand, testified during her deposition that she believed she was fol-

lowing the policy and making a formal complaint by orally informing Smith of Jensen's comments. In response to Boone's complaints to Smith, Boone was assigned a new supervisor as of April 27, 2001. Her new supervisor was Lisa Kindvall.

On April 5, 2001, while Jensen was still Boone's immediate supervisor, Boone was called into a meeting with Smith, Jensen and White. Boone was issued a verbal reprimand for being off of her telephone for more than nine minutes in violation of Larson's policy. After Boone switched to Kindvall's supervision, Boone was provided a Referral Memorandum on April 30, 2001, indicating that Larson had concerns with Boone's work performance, including the need to take 85 to 100 calls per day and/or be available 70 per cent of her shift to take calls; the need to take supervisors' direction and perform rather than resist and being argumentative; and the need to take responsibility for her performance and behavior. (Index of Evidence, Doc.21, Ex. X.) The memorandum also informed Boone that Larson had made an appointment for her with the Mental Health Associates Office and she would be compensated if she chose to attend the appointment. She did not attend the appointment. When presented with the Referral Memorandum, Boone refused to sign it.

After Kindvall began supervising Boone on April 27, 2001, Kindvall issued at least six verbal and written reprimands for failing to perform her job duties, including failing to begin work in a timely fashion, and being unavailable to take calls for one hour without permission. On May 25, 2001, Boone left a voice-mail message for Kindvall that she would not be attending work that day. Kindvall called Boone and informed her it would be an unauthorized absence if she did not report for work that day. Boone arrived at work approximately four hours late that day. On June 14, 2001, Boone arrived to work two hours late.

On May 2, 2001, Boone was called into a meeting with Jeff Rief, Larson's Vice President of Marketing, White, and Smith. During this meeting, Boone was asked to provide more details and to document her allegations against Jensen. Feeling that she had already given all of the information to Smith during the April 2, 2001 meeting, Boone refused to provide any further documentation of her allegations against Jensen. Smith attempted to solicit more information from Boone on May 3, 2001, but Boone was non-responsive. On May 4, 2001, Smith asked Boone to dictate her allegations against Jensen. Boone refused and said she would provide written documentation in her own words to Smith by May 7, 2001. Although Boone did not provide any written documentation, Smith conducted an investigation of Boone's allegations of sexual harassment against Jensen from May 7, 2001 through May 11, 2001. The investigation resulted in the issuance of a written warning to Jensen for making inappropriate comments to Boone. The warning was issued on May 29, 2001.

Larson's sexual harassment policy allows review of sexual harassment complaints by a Corporate Personnel Committee. (Index of Evidence, Doc. 21, Ex. H.) On May 16, 2001, this committee issued a written memorandum addressed to Boone, explaining that the findings from Smith's investigation were that Jensen may have made inappropriate comments to Boone, but that the comments were not as serious as indicated by Boone in her discussion on May 2, 2001. The committee informed Boone that "[a]ppropriate corrective action with Mary will be taken regarding these comments. Your performance feedback will continue with your new team leader and department management to assure

you are getting fair and equitable treatment." (Index of Evidence, Doc. 21, Ex. T.)

As to her merit-based raise, it was eventually awarded to her in May 2001 because she had improved "marginally" and it was a negotiated agreement. (Index of Evidence, Doc. 21, Ex. N.)

Boone's final day of employment at Larson was on June 20, 2001. On that day, Boone was asked to join Rief and White to discuss her work performance. Rief informed Boone that the purpose of the meeting was not to terminate her employment. He did, however, offer a severance package to Boone, indicating that he did not believe Boone's employment with Larson was a "good mesh for her." (Boone Depo. at 67–69.) Boone refused the severance package, stating she was not willing to resign and would not accept a severance package unless it was in writing. Eventually, Boone asked Rief what she needed to do to end the meeting. Rief said Boone needed to listen to White discuss Boone's work performance. Boone listened to White. Then Rief began talking about a severance package again. Boone then said:

> This meeting is over. And he said, you are not going to leave this office. And he started pointing his finger, getting very upset with me, telling me to sit down in my chair and that my attitude is wrong.

> And I said, when you put me under fire like this, this is my attitude, and I don't appreciate it because you are the one to protect me in this environment and my job here. And I am leaving. Who in the hell do you think you are for telling me I cannot go to the bathroom and telling me I cannot leave after you told me all I have to do is sit here and listen to her and what she expects out of me?

> I had to get out of there. My bowels were going to fire. And I ran to the bathroom, and I was a wreck, and Rona was in that bathroom wondering, what the heck is going on, and I don't even remember what I said to her. I was in the bathroom. After I left, I threw water on my face, I cleaned up, I tucked my clothes in, walked back directly into their office, and they were gone.

> Then I went right over to Kevin Lathrop's desk, and I said. I want you to know that I did not leave this building. I came back with every intention to finish this meeting with them, and they are gone. Where did they go? They left for lunch.

(Boone Depo. at 70–71.) Boone then left for lunch. When she returned from lunch, she went back to her desk and took calls. White approached Boone to inform her that Rief wanted to see her in his office. Boone testified that she "just knew it was the peak." (Boone Depo. at 72.) During this afternoon meeting with Rief, Boone was informed that her employment with Larson had ended effective June 20, 2001. Boone asked for a termination letter, which was initially refused, but was given to her later the same day.

The letter from Rief, requested by Boone, indicates the subject is "Confirmation of Termination." The first paragraph states "[i]n the many feedback sessions we have had with you in recent months, you have consistently refused to take direction from your supervisors and have been insubordinate. Therefore, our employment with you has ended effective today, June 20." (Index of Evidence, Doc. 21, Ex. LL.)

In her deposition, Boone contends that the performance marks on which she was being evaluated were not given to the rest of her department until June 11, 2001. (Boone Depo. at 59–60.) The standards communicated to Boone were to take 80 to

100 calls per shift on the Homeowner line and to be available to take calls 70 per cent of her shift. Even taking the evidence in the light most favorable to Boone, the record shows that these goals were communicated to the employees in Boone's department as early as May 4, 2001. An e-mail message from Dixie White, attached as an exhibit to Boone's deposition, states "Almost everyone in the department that was on the phone met the goal of 70% or higher percentage available." In addition, a memo from White and team leaders to all customer service representatives dated May 4, 2001, with a subject line of "What is expected from you?" states that "Availability should be 70% each day with Homeowners taking between 80–100 calls per day (average) and Dealer agents taking 140 plus each day."

Boone filed a Charge of Discrimination with the South Dakota Division of Human Rights on November 19, 2001. The South Dakota Division of Human Rights issued a Determination of No Probable Cause and dismissed Boone's Charge of Discrimination on April 5, 2002. This action was filed on September 25, 2002.

In this action, Boone asserts four causes of action: (1) gender discrimination, in violation of 42 U.S.C. § 2000e–2(a)(1); (2) sexual harassment; (3) retaliation, in violation of 42 U.S.C. § 2000e–3(a); and (4) intentional infliction of emotional distress. Boone seeks an award of compensatory damages, including back pay, front pay and emotional distress damages, punitive damages, costs, attorney fees and expert fees.

In its summary judgment motion, Larson argues: (1) Boone has failed to exhaust her administrative remedies as to her gender discrimination claim; (2) she has failed to establish a prima facie case of gender discrimination and she cannot rebut the legitimate, nondiscriminatory rea-

sons Larson identified for Boone's alleged termination; (3) Boone failed to establish a prima facie case of hostile work environment sexual harassment and Larson took reasonable care to prevent harassment and promptly corrected any harassment she reported; (4) she cannot establish a prima facie case of retaliation or rebut Larson's legitimate, nondiscriminatory reasons for any alleged adverse employment action taken against her; (5) Larson's conduct did not amount to outrageous conduct; (6) Larson did not engage in any "malicious conduct" sufficient to justify an award of punitive damages under either 42 U.S.C. § 1981a(b)(1) or SDCL § 21–3–2 and 21–1–4.1; and (7) Larson is entitled to an award of attorney fees and costs.

## DECISION

Summary judgment is appropriate if the moving party establishes that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, this Court views the evidence in a light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'" *Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir.1992) (quoting Fed.R.Civ.P. 56(e)). The Eighth Circuit has "repeatedly cautioned that summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based. Summary judg-

ment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir.1998) (citations omitted). It is also clear, however, that "[t]o survive a motion for summary judgment, the nonmoving party must 'substantiate [her] allegations with sufficient probative evidence that would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy.'" *Putman v. Unity Health System*, 348 F.3d 732, 2003 WL 22517284 (8th Cir. Nov.7, 2003) (quoting *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir.1995)).

One issue relevant to all of Plaintiff's claims is whether Plaintiff's employment was terminated by Larson or whether she voluntarily resigned her employment. Larson is willing, solely for purposes of the summary judgment proceedings, to assume that Larson terminated Plaintiff's employment.

*A. Gender Discrimination*

In the First Cause of Action, Boone alleges Larson is liable for gender discrimination in violation of Title VII. Title VII makes it unlawful for an employer to discriminate against an employee on the basis of, among other things, the individual's sex. *See* 42 U.S.C. §§ 2000e–2(a)(1). When a plaintiff is not able to produce direct evidence of age or sex discrimination, the Court applies the burden-shifting analysis of *McDonnell Douglas*, which first requires the plaintiff to demonstrate a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Boone has not shown any direct evidence of gender discrimination. Thus, she is required to establish a prima facie case.

Larson first argues that Plaintiff failed to exhaust her administrative remedies on her gender discrimination claim. The issue of exhaustion is questionable in this case. Because Defendants are entitled to summary judgment on the merits of Plaintiff's gender discrimination claim, the Court will not resolve the issue of whether Plaintiff's gender discrimination claim is exhausted.

■ To establish a prima facie case of gender discrimination, Boone must demonstrate: (1) that she is within the protected class; (2) that she was qualified to perform her job; (3) that she suffered an adverse employment action; and (4) that nonmembers of her class (the opposite gender in the Title VII sex discrimination context) were not treated the same. *See Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1157 (8th Cir.1999). The fourth element of the prima facie case in a Title VII context has also been articulated as requiring that there be "some evidence that would allow the inference of improper motivation." *Landon v. Northwest Airlines, Inc.*, 72 F.3d 620, 624 (8th Cir.1995). The Supreme Court recognized that elements of a plaintiff's prima facie case will necessarily vary based upon the differing factual situations in Title VII cases. *See McDonnell*, 411 U.S. at 802, n. 13, 93 S.Ct. 1817; *Hindman*, 145 F.3d at 990–91 (recognizing that the proof necessary to establish a prima facie case in discrimination cases is "not inflexible" and "varies somewhat with the specific facts of each case."). The Eighth Circuit has noted that "[a]n inference of discrimination may be raised by evidence that a plaintiff was replaced by or treated less favorably than similarly situated employees who are not in the plaintiff's protected class." *Price v. S–B Power Tool*, 75 F.3d 362, 365 (8th Cir.1996).

If plaintiff establishes a prima facie case, the burden then shifts to the employer to

advance a legitimate, nondiscriminatory reason for the adverse employment action. *See Fast v. Southern Union Co., Inc.*, 149 F.3d 885, 890 (8th Cir.1998). If the employer articulates such a reason, the plaintiff must then demonstrate that the employer's stated reason is pretextual and that the real reason for the employer's adverse employment action was unlawful sex discrimination. *See id.; Breeding*, 164 F.3d at 1157. The plaintiff carries at all times the burden of proving that her termination was motivated by intentional discrimination. *See Fast*, 149 F.3d at 890; *Young v. Warner–Jenkinson Co., Inc.*, 152 F.3d 1018, 1021 (8th Cir.1998).

■ As a woman, plaintiff meets the first element of her prima facie case. *See Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir.1996) (first factor in Title VII sex discrimination claim can be shown if plaintiff is a man or a woman). Next, Plaintiff must show that she was qualified to perform her job. The performance evaluations Plaintiff received prior to her promotion clearly demonstrate that she was qualified to perform the job of a dealer line representative. After her promotion to homeowner line representative, however, Plaintiff never received a performance evaluation indicating she was adequately performing the essential functions of that job. While Plaintiff asserts she was being held to a higher standard of performance for her evaluations as a homeowner line representative than other similarly situated employees, the exhibits attached to her deposition indicate that the same standards were applied to other homeowner line representatives.

The third element Plaintiff must establish is that she suffered an adverse employment action. While Larson will contest this point at trial if summary judgment is not granted, it is willing to assume for purposes of the summary judgment motion that Plaintiff's employment was terminated by Larson. Thus, for purposes of the pending motion, Plaintiff has met the third element of her prima facie case.

■ "In determining whether employees are 'similarly situated' for purposes of establishing a prima facie case [the Court] consider[s] whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1309 (8th Cir.1994). Plaintiff has failed to point to evidence establishing that any male homeowner line representatives with similar performance problems were disciplined in more favorable ways than her. In addition, Plaintiff has not pointed to any evidence that another employee who had been accused of being insolent to the same degree that she has been accused of that was disciplined in a more favorable way. Thus, Plaintiff has failed to demonstrate that nonmembers of her class were not treated the same. Moreover, Plaintiff has not pointed to any evidence to allow the inference of improper motivation as articulated by the Eighth Circuit in *Landon*, 72 F.3d at 624.

The Supreme Court has held that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) (emphasizing that the prima facie case is neither "rigid" nor "mechanized" and that the primary focus is whether an employer has treated an employee less favorably than other employees for an impermissible reason). While the burden is not onerous, Plaintiff has not established elements two and four of her prima facie case. *See Breeding*, 164

F.3d at 1157 (elements of prima facie case).

■ Even if Plaintiff had established a prima facie case of gender discrimination, Larson has met its burden of production in advancing a legitimate, nondiscriminatory reason for her termination. On the day of Plaintiff's termination, she walked out of a meeting with Larson's Vice President of Marketing, Rief, and Dixie White, Plaintiff's supervisor, while they were discussing her poor job performance. Although Plaintiff disputes the reason she left the meeting, she has admitted that she informed Rief and White that the meeting was over and exited Rief's office. Larson advances Plaintiff's admitted behavior on June 20, 2001 as its legitimate, nondiscriminatory reason for her termination. The words admittedly used by Plaintiff in speaking to Rief and White demonstrated insubordination. During her deposition in this case, Plaintiff recognized that this day was "the peak." Moreover, the reasons listed on her termination letter were that she had "consistently refused to take direction from [her] supervisors and have been insubordinate" for "months." (Index of Evidence, Doc. 21, Ex. LL.)

Larson having met its burden of production in advancing a legitimate, nondiscriminatory reason for terminating Boone, the burden shifts back to Boone to demonstrate that the proffered reason was not the true reason for her termination. Boone has not shown there is a genuine issue of material fact that Larson's asserted reason for terminating Plaintiff was pretextual and that the real reason for Larson's termination was unlawful sex discrimination. First, the person Plaintiff accuses of sex discrimination is Jensen and there is no evidence that Jensen participated in the decision to terminate her. Boone has not pointed to any evidence to show that Rief was motivated by intentional sex

discrimination in terminating her. In addition, Boone has failed to point to any evidence showing there is a genuine issue of material fact that either White or Smith, to the extent that they participated in the decision to terminate Boone, were motivated by intentional sex discrimination. There are no statements or actions in the record to show that Rief, White or Smith harbored or were motivated by intentional sex discrimination.

*B. Hostile Work Environment Sexual Harassment*

■ To prevail on a claim of hostile work environment sexual harassment, in violation of Title VII, Boone must prove: (1) that she is a member of a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; and (4) that the harassment affected a term, condition, or privilege of her employment. *See Duncan v. General Motors Corp.*, 300 F.3d 928, 933 (8th Cir.2002) (quoting *Beard v. Flying J., Inc.*, 266 F.3d 792, 797–98 (8th Cir.2001)); *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that "workplace harassment can violation Title VII's prohibition against 'discrimination ... because of ... sex,' 42 U.S.C. § 2000e–2(a)(1), when the harasser and the harassed employee are of the same sex."). There is no dispute about the first element that Boone is a member of a protected group, but the parties dispute the remaining elements.

■ The second element of a sexual harassment claim is that the conduct must be " 'unwelcome' in that the plaintiff neither solicited it nor invited it and regarded the conduct as undesirable or offensive." *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 966 (8th Cir.1999). For example, if Boone engaged in behavior similar to that

which she claimed was unwelcome and offensive, she cannot meet this element. *See id.; Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 737 (8th Cir.2000) (holding that "[a] plaintiff cannot create a genuine issue of material fact with regard to unwelcome behavior when she engages in the conduct complained about.").

Kool submitted an affidavit stating that "[d]uring my employment I overheard Plaintiff and Mary Jensen ('Jensen'), as well as other female employees, engage in casual, joking conversations with each other which at times would encompass a discussion of physical attributes." (Index of Evidence, Doc. 21, Ex. M.) He further stated that "[d]uring Plaintiff's employment, she would complain to her co-workers about Jensen's evaluation of her work performance, but never said anything about conversations with, or comments by, Jensen." (*Id.*) Boone, however, disputes that she joked with Jensen about female's physical attributes. Thus, a genuine issue of material fact exists on the issue of whether Jensen's conduct was unwelcome and offensive to Plaintiff.

Explaining the element that the harassment must be based upon the complainant's sex, the Eighth Circuit stated: "[w]hether harassing conduct constitutes discrimination based on sex is determined by whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Scusa*, 181 F.3d at 965. The Court will assume for purposes of the summary judgment motion that Jensen's comment about the size of Boone's breasts were based upon Boone's sex.

▆▆▆▆ The fourth element of Boone's sexual harassment claim is that the alleged harassment must be so severe or pervasive that it alters a term, condition or privilege of employment. *See Duncan*, 300 F.3d at

934. "To clear the high threshold of actionable harm, [Boone] has to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult.' " *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations omitted)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Oncale*, 523 U.S. at 81, 118 S.Ct. 998 (internal quotation omitted). The totality of the circumstances must be evaluated to determine whether the conduct is sufficiently severe or pervasive, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367. Title VII is " 'not designed to purge the workplace of vulgarity.' " *Duncan*, 300 F.3d at 934. The Supreme Court explained that:

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code." Properly applied, they will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." B. Linderman & D. Kadue, Sexual Harassment in Employment Law 175 (1992). We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . . .

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (some citations omitted).

Comparing Jensen's alleged conduct to that alleged in other reported sexual

harassment cases demonstrates that Jensen's conduct pales in comparison to cases finding there is sufficient evidence to survive summary judgment. *See Moring v. Arkansas Dep't of Corr.*, 243 F.3d 452, 455 (8th Cir.2001) (conduct severe enough to support jury verdict for sexual harassment); *Mems v. City of St. Paul*, 224 F.3d 735, 738–39 (8th Cir.2000) (conduct sufficiently severe or pervasive to create a submissible hostile work environment claim). Moreover, the conduct in this case was far less severe than the conduct in cases in which the Eighth Circuit found there was no triable issue for the jury. For example, in *Duncan*, the Eighth Circuit found that although the alleged offender's conduct was "boorish, chauvinistic and decidedly immature," the conduct did not create an objectively hostile work environment permeated with sexual harassment. 300 F.3d at 934–35. The complained of conduct consisted of a request for a relationship, four or five isolated incidents of briefly touching the plaintiff's hand, a request to draw a planter of a man that had a hole in the front of the man's pants that allowed for a cactus to protrude, showing plaintiff a child's pacifier shaped like a penis that he kept at work, and teasing about plaintiff being a member of the "Man Hater's Club." *See id.* at 931–32, 935; *Tuggle v. Mangan*, 348 F.3d 714 (8th Cir.2003) (comparing cases involving evidence sufficient to create a triable issue of hostile work environment versus cases with insufficient evidence).

## C. Retaliation—Title VII

Title VII provides that it shall be an unlawful employment practice for any employer to retaliate against an employee or an applicant for employment "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a) (1994). To establish a prima facie case of retaliation under Title VII, Boone must show that she engaged in a protected activity, that Larson took adverse action against her, and that there is a connection between the two. *See Scott v. County of Ramsey*, 180 F.3d 913, 917 (8th Cir.1999). If Boone makes this showing, a presumption of retaliation arises, and the burden of production shifts to Larson to advance a legitimate reason for Boone's termination. *See id.* If a legitimate reason is advanced, the presumption of retaliation disappears and " 'the trier of fact proceeds to decide the ultimate question: whether plaintiff has proven that the defendant intentionally discriminated against the plaintiff.' " *Id.* (quoting *Ryther v. KARE 11*, 108 F.3d 832, 836 (8th Cir.1997) (en banc)). "In some situations, this can be shown indirectly by establishing that the defendant's proffered reason is merely a pretext for retaliation." *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

The Court held above that Larson's termination of Boone was not in violation of Title VII. Boone, however, is not required to prevail on her Title VII claim to prevail on her retaliation claim: " 'as long as the employee had a reasonable belief that what was being opposed constituted discrimination under Title VII, the claim of retaliation does not hinge upon a showing that the employer was in fact in violation of Title VII.' " *Sisco v. J.S. Alberici Const. Co., Inc.*, 655 F.2d 146, 150 (8th Cir.1981); *see Evans v. Kansas City, Missouri Sch. Dist.*, 65 F.3d 98, 100–01 (8th Cir.1995) (same). The Court concludes that no reasonable person could have believed that the two isolated incidents of Jensen commenting about Boone's

breasts violated Title VII's standard. *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 269–71, 121 S.Ct. 1508, 1509–10, 149 L.Ed.2d 509 (2001) (applying the reasonable person standard to a Title VII retaliation claim). Although the comments may have made Boone uncomfortable, the comments were not the sort of conduct that is "severe or pervasive" enough to alter the terms and conditions of her employment. *See id.*

Even if a reasonable person could have believed that Jensen's comments violated Title VII's standard, for the reasons set forth below, Boone's claim of retaliation does not survive Larson's summary judgment motion. Boone contends the conduct of the decision makers, Rief, White and Smith, that amounts to retaliation was the increased scrutiny, different standards for performance, constant reprimands, being called into meetings and the papering of her file. She alleges that Kindvall was responsible for papering her file with negative evaluations after Smith began her investigation in May 2001. Boone further asserts that a jury could reasonably infer that Kindvall was papering Boone's file "because Smith was frustrated with [Boone]." (Plaintiff's Brief, Doc. 37 at 21.)

■ The first question to be answered is when did Boone first engaged in statutorily protected activity. Boone contends that her comment to Jensen that she was dressed appropriately in February 2001 should mark the first date for evaluating conduct for retaliatory intent. Larson contends that the first date for evaluating Plaintiff's retaliation claim is April 2, 2001, when Boone first complained to Smith about Jensen's comments.

■ The Court find that the first time Boone engaged in statutorily protected activity was during her meeting with Smith on April 2, 2001. Boone's response to Jensen's February 2001 comment was to ask a male co-worker whether she was dressed appropriately. When the male co-worker responded that Boone was not dressed inappropriately, Boone said to Jensen "there you have it, I'm dressed appropriately, so leave me alone." (Boone Depo. at 22–23.) This response indicated Boone objected to Jensen commenting on Boone's attire. It cannot be inferred from Boone's response to Jensen's comment, however, that Boone objected to Jensen's comment because it amounted to unlawful sexual harassment or gender discrimination. Although Boone may have found the comments offensive and they made Boone uncomfortable, there is no genuine issue of material fact for trial that Boone engaged in statutorily protected activity in February 2001. Thus, Boone's retaliation claim will be evaluated based upon conduct beginning on April 2, 2001.

■ Boone does not allege that any additional inappropriate comments about her physical attributes or dress were made by any Larson employee after April 2, 2001. Rather, she contends that the negative performance evaluations and continued criticism of her job performance by supervisors other than Jensen were motivated by a retaliatory intent for reporting her allegations against Jensen to Larson.

Other than mere speculation, Boone has presented no evidence that Kindvall had a retaliatory intent for evaluating Boone's job performance. There is no evidence of statements or conduct by Kindvall to create a fact issue about Kindvall's intent in criticizing Boone's job performance. Boone does not argue that she regularly met the standards of performance relating to call availability, which was one of Kindvall's criticisms of Boone's performance. Rather, Boone maintains there were reasons for not meeting Larson's expectations of 70 per cent availability and 85 to 100

calls per shift. As discussed above, although Boone makes an allegation that she was held to a higher standard of performance, the evidence in the record establishes that the other homeowner line representatives were held to these same standards in the same time period. There is no evidence of a causal connection between Kindvall's criticisms of Boone's performance and Boone's reporting of Jensen's comments to Smith. Boone has failed to substantiate her allegations of retaliation by Kindvall " 'with sufficient probative evidence that would permit a finding in [her] favor based on more than mere speculation, conjecture, or fantasy.' " *Putman*, 348 F.3d 732.

As to Rief and White, Boone has not pointed to any evidence to indicate they had a retaliatory intent in discharging Boone for making allegations of sex discrimination or sexual harassment against Jensen. There is no evidence of any comments or conduct by Rief or White that create a triable issue for the jury on whether there was a causal connection between Boone's allegations against Jensen and Boone's termination.

The other individual involved in Boone's termination was Smith. Although Smith may have been "frustrated" with Boone due to her refusal to provide additional information to Smith in May 2001 about her allegations, requiring Smith to conduct an investigation without a written statement from Boone, that evidence does not show Smith had a retaliatory intent for participating in Boone's termination. Moreover, despite Boone's refusal in May 2001 to further assist Smith, Smith conducted the investigation and caused Jensen to be reprimanded for her inappropriate comments. There is no genuine issue of material fact for trial that Boone's reporting of Jensen's comments to Smith were causally connected to Smith's participation in Boone's termination.

The evidence in the record does not establish a prima facie case of retaliation. If Boone had established a prima facie case of retaliation, the burden of production would have shifted to Larson. As explained above in connection with the gender discrimination aspect of the Title VII claim, Larson has advanced a legitimate reason for Boone's termination. As with the gender discrimination claim, Boone has not produced sufficient evidence to show that Larson's proffered reason is merely a pretext for retaliation.

If Boone had shown pretext, the presumption of retaliation would disappear from the case and Boone would be required to carry the burden to show there is sufficient evidence in the record to present the ultimate question to the jury: " ' whether plaintiff has proven that the defendant intentionally discriminated against the plaintiff.' " *Scott*, 180 F.3d at 917 (quoting *Ryther*, 108 F.3d at 836. 509 U.S. at 507–08, 113 S.Ct. 2742). Plaintiff has not met this burden. Thus, Larson is entitled to summary judgment on Plaintiff's retaliation claim.

### D. Intentional Infliction of Emotional Distress

In order to prevail on a claim for intentional infliction of emotional distress, Boone must establish:

(1) extreme and outrageous conduct by the defendant; (2) that the defendant intended to cause severe emotional distress; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress must result.

*See Christians v. Christians*, 637 N.W.2d 377, 382 (S.D.2001) (citations omitted). "For conduct to be 'outrageous' it must be

so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *See Tibke v. McDougall,* 479 N.W.2d 898, 907 (S.D. 1992) (citations omitted). While Jensen's comments were inappropriate, there is no genuine issue of material fact that her comments were "atrocious" or "utterly intolerable in a civilized society." Accordingly,

IT IS ORDERED:

1. That Plaintiff's Motion to Extend, Doc. 23, is granted.

2. That Defendants' Motion for Summary Judgment, Doc. 20, is granted.

## JUDGMENT

In accordance with the Memorandum Opinion and Order filed this date with the Clerk,

IT IS ORDERED, ADJUDGED and DECREED that Judgment is entered in favor of Defendant Larson Manufacturing Company, Inc. and against the Plaintiff Mona Boone on all of Plaintiff's claims in this action.