DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CITY OF HALLANDALE BEACH, FLORIDA,**
Appellant,

v.

**DANIEL ROSEMOND,**
Appellee.

No. 4D2022-2642

[June 5, 2024]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Michael A. Robinson, Judge; L.T. Case No. 17-1355 CACE.

Christopher J. Stearns and Jonathan H. Railey of Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A., Fort Lauderdale, for appellant.

Rebecca A. O'Hara and Kraig A. Conn of Florida League of Cities, Inc., Tallahassee, amicus curiae in support of appellant.

Brian L. Lerner, Robert C.L. Vaughan, and Anisha C. Atchanah of Kim Vaughan Lerner LLP, Fort Lauderdale, for appellee.

GERBER, J.

The city appeals from the circuit court's final judgment in favor of a former employee who prevailed on his claims against the city for whistleblower retaliation and breach of contract. The city argues the circuit court erred in two primary respects: (1) denying the city's directed verdict motions on both claims; and (2) providing incorrect jury instructions on the whistleblower retaliation claim.

On the city's first argument, we conclude the circuit court erred in denying the city's directed verdict motion as to the former employee's whistleblower retaliation claim. Our conclusion on the city's first argument moots the city's second argument. Thus, we reverse the final judgment on the whistleblower retaliation claim, and remand for entry of final judgment in the city's favor on that claim. We affirm the final judgment in the former employee's favor on his breach of contract claim.

Our opinion will focus primarily on the whistleblower retaliation claim. We will present this opinion in five sections:

1. The former employee's trial evidence;
2. The city's directed verdict motion;
3. The jury's verdict, the city's post-verdict motions, and the circuit court's final judgment;
4. The parties' arguments on appeal; and
5. Our review.

## 1. *The Former Employee's Trial Evidence*

We present the former employee's trial evidence in the light most favorable to him as the non-moving party on the city's directed verdict motions. *See Meruelo v. Mark Andrew of Palm Beaches, Ltd.*, 12 So. 3d 247, 250 (Fla. 4th DCA 2009) ("When an appellate court reviews the grant of a directed verdict, it must view the evidence and all inferences of fact in a light most favorable to the nonmoving party.") (citation omitted). As the former employee was employed by the city at all times material to this appeal, we shall refer to him from this point forward as "the employee."

In February 2015, when the employee was serving as deputy city manager, the city attorney filed an internal racial discrimination complaint on her own behalf against then-City Commissioner Keith London. The city retained an outside law firm to investigate the city attorney's complaint.

When the investigators interviewed the employee in April 2015, he stated that Commissioner London, in a separate situation, allegedly had committed a Sunshine Law violation and had violated a city rule prohibiting commissioners from directing employees' actions, rather than through the city manager. When the investigators interviewed Commissioner London, they made him aware of the employee's statements regarding the alleged violations.

Over the next several months, Commissioner London did not show any animosity toward the employee. However, in October 2015, when the city manager resigned, and the five-member city commission voted 3-2 to appoint the employee to serve as city manager effective January 1, 2016, Commissioner London was one of the two votes against the employee's promotion. The other commissioner voting against the employee's promotion was Commissioner Michele Lazarow.

In February 2016, that is, one month into the employee's service as city manager, the investigators provided the employee with their report regarding the city attorney's internal racial discrimination complaint against Commissioner London. The report stated the investigators had been unable to conclude Commissioner London had discriminated against the city attorney. The investigators' report also mentioned the employee's statements regarding Commissioner London's other alleged violations. The employee forwarded the investigators' report to the city commission.

Months later, in November 2016, city voters elected a new City Commissioner, Annabelle Lima-Taub, for whom Commissioner London had served as campaign manager. The day after Commissioner Lima-Taub had been sworn in and the city commission had selected Commissioner London to serve as vice mayor, now-Vice Mayor London requested a special city commission meeting be held to discuss the employee's contract.

At that special meeting, which occurred later in November 2016, Vice Mayor London discussed three incidents which he said required terminating the employee for cause. Vice Mayor London's description of those incidents were incomplete in some respects and false in others.

After Vice Mayor London's presentation, he moved to suspend the employee as city manager, appoint the deputy city manager as interim city manager, and commence the procedure for terminating the employee's contract. The motion passed 3-2, with Vice Mayor London and Commissioners Lazarow and Lima-Taub in the majority.

The city charter required a "special hearing to allow the manager to defend whatever reasons for the termination being put forth." That special hearing occurred in late December 2016. Vice Mayor London requested a motion to terminate the employee, and stated the termination and its reasons should be made a "permanent record" so prospective employers could see such record. Commissioner Lazarow moved to adopt such a resolution, and added the resolution should reflect the employee was terminated "with cause." The motion passed 3-2, with Vice Mayor London and Commissioners Lazarow and Lima-Taub in the majority.

The employee then sued the city on two claims: (1) whistleblower retaliation; and (2) breach of contract.

The employee's whistleblower retaliation claim alleged the city commission's termination of his employment violated Florida's Whistle-blower's Act, section 112.3187(4)(a)-(b), Florida Statutes (2016) (a government entity "shall not dismiss, discipline, or take any other adverse

3

personnel action against an employee for disclosing information pursuant to the provisions of this section" and "shall not take any adverse action that affects the rights or interests of a person in retaliation for the person's disclosure of information under this section").  According to the employee, his 2015 allegations about then-Commissioner London had caused now-Vice Mayor London in November 2016 to create the three pretextual reasons for the employee's termination.  The employee summarized his allegations as follows:

> It was Vice Mayor London who initiated and coordinated the efforts to suspend and then terminate … [the employee].  This included, among other things, alleging the three stated bases for removal, putting together and choosing to omit documents pertaining to the removal, presenting the case for the removal, spearheading the process that would be used to conduct the public hearing, … and being the person to make the point of how important it was to make the termination part of the permanent record.

The employee's breach of contract claim alleged the city commission's termination of his employment breached his employment agreement.  Pertinent to this appeal, the employee specifically alleged his employment agreement provided that being terminated "with cause" required him to have committed "misconduct" as defined by section 443.036(29), Florida Statutes (2016), and he had not committed any "misconduct."

During the employee's trial testimony, he provided additional facts to clarify or refute the three reasons upon which Vice Mayor London had relied to support the employee's suspension and termination.  The employee testified Vice Mayor London had not fully stated some facts, and had misrepresented other facts, during the city commission's November and December 2016 special meetings which had led to the employee's suspension and termination.

Vice Mayor London testified that the employee's 2015 statements to the investigators had not motivated either his October 2015 vote against promoting the employee to become city manager or his November and December 2016 votes to suspend and terminate the employee.

Commissioner Lazarow testified the employee's 2015 statements to the investigators had not motivated either her October 2015 vote against promoting the employee to become city manager or her November and December 2016 votes to suspend and terminate the employee.  Commissioner Lazarow further testified the November 2016 special

4

meeting was the first time she had become aware that Vice Mayor London wanted to suspend and terminate the employee. She testified she had not "blindly followed" Vice Mayor London's recommendation to suspend and terminate the employee. Rather, during the November and December 2016 special meetings, she had considered Vice Mayor London's reasons, reviewed the documents which he had presented, and asked questions.

Commissioner Lima-Taub testified that because she had not been a city commissioner before the November 2016 election, she was unaware of the employee's 2015 statements to the investigators when she voted to suspend and terminate the employee in November and December 2016. Commissioner Lima-Taub also testified she had voted to suspend and terminate the employee based on Vice Mayor London's presentation.

### 2. The City's Directed Verdict Motion as to The Employee's Whistleblower Retaliation Claim

After the employee rested, the city's trial counsel moved for a directed verdict as to both the employee's whistleblower retaliation claim and his breach of contract claim.

Pertinent to the whistleblower retaliation claim, the city's trial counsel argued: "A plaintiff cannot prove an improper animus for whistle blowing when it relates to a City Commission unless [the plaintiff] can prove an intent to retaliate by the majority. … [Here, that means] all three of the people who voted [to terminate the employee] must share the motive to terminate." However, according to the city's counsel: "[The plaintiff has] contended that one member of this five[-person] committee had an improper motive, only [Vice Mayor] London. Under the law, that's not sufficient to let [the plaintiff's whistleblower retaliation claim] go to a jury. [The plaintiff has] introduced no evidence [of retaliatory motive] at all related to [Commissioners Lazarow and Lima-Taub]."

In response to the city's argument as to why the city could not be found liable for whistleblower retaliation, the plaintiff's counsel relied upon a "cat's paw" theory. The plaintiff's counsel described the "cat's paw" theory as "simply mean[ing] if one [commissioner] is … [making] the charge, making the recommendations, suggesting what to do, and you don't have evidence of [other commissioners'] independent investigation or doing something on [their] own, that can be a form of retaliation."

The circuit court summarily denied the city's directed verdict motion as to both the whistleblower retaliation claim and the breach of contract claim. After the city presented its evidence and rested, the city renewed

its directed verdict motion.  The circuit court again summarily denied the city's motion.

### 3. *The Jury's Verdict, the City's Post-Verdict Motions, and the Circuit Court's Final Judgment*

On the employee's whistleblower retaliation claim, the jury found in the employee's favor by finding, in response to specific interrogatories:  the employee had engaged in protected activity; the employee had suffered an adverse employment action; the city had taken an adverse employment action against the employee because of his protected activity; the city's adverse employment action had not been predicated upon grounds other than, and would not have been taken absent, the employee's exercise of protected activity; and the employee was entitled to recover his damages. The jury also determined the employee's damages amount on that claim.

On the employee's breach of contract claim, the jury found in the employee's favor by finding, in response to specific interrogatories:  the city had breached its contract with the employee by terminating the employee for reasons other than "misconduct"; and the plaintiff was entitled to recover his damages.  The jury also determined the employee's damages amount on that claim.

Following the jury's verdict, the city filed a renewed motion for directed verdict and motion for judgment notwithstanding the verdict.  Pertinent to the whistleblower retaliation claim, the city again argued the employee, as a matter of law, had to show Vice Mayor London and Commissioners Lazarow and Lima-Taub all had harbored an illegal intent to retaliate against the employee because of his statements to the investigators in 2015 when they voted to suspend and terminate the employee in November and December 2016.  However, the city argued, the employee testified the only person whom he believed had possessed any retaliatory animus against him was Vice Mayor London.  The employee could not identify any evidence indicating Commissioner Lazarow or Commissioner Lima-Taub had been motivated by an intent to retaliate against him.  Further, the city argued, Commissioner Lima-Taub could not have intended to retaliate against the employee because she had not known the employee had given statements to the investigators in 2015 at the time she had voted to suspend and terminate the employee in November and December 2016.

The circuit court entered separate written orders summarily denying the city's motions.  The circuit court also entered a final judgment in the employee's favor for the combined damages amounts on his whistleblower retaliation claim and his breach of contract claim.

#### 4. *The Parties' Arguments on Appeal*

The city then timely filed this appeal. Pertinent to the whistleblower retaliation claim, the city has repeated its directed verdict motions' argument that the employee, as a matter of law, had to show Vice Mayor London and Commissioners Lazarow and Lima-Taub all harbored an illegal intent to retaliate against the employee due to his statements to the investigators in 2015 when they had voted to suspend and terminate the employee in November and December 2016. The city argues while the employee believed Vice Mayor London harbored a retaliatory animus leading to London's vote to suspend and terminate the employee, the employee presented no evidence that Commissioners Lazarow and Lima-Taub harbored a retaliatory animus leading to their votes to suspend and terminate the employee.

The employee pertinently responds he did not have to show each of the three city commissioners who had voted to suspend and terminate him harbored a retaliatory animus against him. Rather, the employee responds, he was permitted to prove the city's liability for whistleblower retaliation under a "cat's paw" theory which, according to the employee, "simply requires that the supervisor's influence with the decisionmaker be strong enough to actually cause the adverse employment action." Here, the employee argues, "[Vice Mayor] London's almost absolute control and choreography of the City's retaliatory campaign against [the employee] was demonstrated beyond refute and without serious contradiction."

#### 5. *Our Review*

Our review is de novo. *See Meruelo*, 12 So. 3d at 250 ("The standard for reviewing a trial court's ruling on a motion for directed verdict is de novo."). "A trial court should grant a motion for directed verdict when the evidence, viewed in the light most favorable to the non-moving party, shows that a jury could not reasonably differ about the existence of a material fact and the movant is entitled to judgment as a matter of law." *Id.*

We conclude the "cat's paw" liability theory upon which the employee had relied was not available as a means to establish a whistleblower retaliation claim in this case. In *State v. Bracewell*, 220 So. 3d 1228 (Fla. 1st DCA 2017), our sister court explained how the "cat's paw" liability theory operates in the employment law context:

> The "cat's paw" metaphor derives from a seventeenth-century French fable involving a conniving monkey who

convinces a cat to reach into a fire to retrieve roasting chestnuts. The cat burns its paws in the process and the monkey escapes unscathed with the chestnuts. In the employment law context, cat's paw liability refers to a situation in which a biased subordinate, who lacks decisionmaking power, clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers. In other words, by merely effectuating or rubber-stamping a discriminatory employee's unlawful design, the employer plays the credulous cat to the malevolent monkey and, in so doing, allows itself to get burned—i.e., successfully sued.

*Id.* at 1231 (internal citations, quotation marks, and brackets omitted).

Applying our sister court's explanation, the city commission's structure here does not permit the "cat's paw" liability theory's application. Vice Mayor London was not a "subordinate, who lacks decisionmaking power." Rather, Vice Mayor London was a "decisionmaker," along with Commissioners Lazarow and Lima-Taub and the remaining two city commissioners. The employee's "cat's paw" liability theory does not apply.

Because a "cat's paw" liability theory does not apply here, we have considered whether a whistleblower retaliation claim can still be shown where the personnel decision was made by equal decisionmakers, only one of whom was alleged to have harbored an animus towards the plaintiff. Two federal Eleventh Circuit cases suggest no such liability can be shown.

In *Mason v. Village of El Portal,* 240 F.3d 1337 (11th Cir. 2001), the Eleventh Circuit reviewed a case in which a police chief had filed a racial discrimination complaint under 42 U.S.C. § 1983 against the municipality whose village council had voted 3–2 not to reappoint him. *Id.* at 1338-39. The municipality filed a summary judgment motion, which the trial court granted. *Id.* at 1339. The trial court found although a triable issue of fact remained as to whether one majority member's nondiscriminatory reasons were pretextual, the police chief had presented no credible evidence to show the other two majority members' nondiscriminatory reasons were unworthy of belief. *Id.*

On the police chief's appeal, the Eleventh Circuit affirmed. *Id.* at 1341. The Eleventh Circuit stated, "the critical issue on appeal is whether the alleged racially discriminatory motive of only one member of a three-member majority of a five-member council can give rise to municipal liability." *Id.* at 1339. The Eleventh Circuit "agree[d] with the trial court

8

that it does not." *Id.* The Eleventh Circuit reasoned that without evidence of the other two council members' nondiscriminatory reasons being unworthy of belief, "we will not presume [the other two council members] shared [the racially discriminating council member's] motives." *Id.*

The following year, the Eleventh Circuit reviewed a similar case—*Matthews v. Columbia County*, 294 F.3d 1294 (11th Cir. 2002). In *Matthews*, three members of a five-member county commission voted to eliminate several county positions, including the plaintiff's position. *Id.* at 1295. The plaintiff filed a complaint against the county under 42 U.S.C. § 1983, alleging she was being retaliated against for her prior protected speech on a county business matter. *Id.* A jury returned a verdict in the plaintiff's favor. *Id.* at 1296. The jury specifically found the plaintiff's protected speech had motivated only one majority commissioner to vote to eliminate the plaintiff's position. *Id.* The jury also specifically found the other two majority commissioners had been "influenced in [their] vote[s] by [the one majority commissioner] who was motivated to eliminate Plaintiff's employment because of the Plaintiff's protected speech activity[.]" *Id.* The county moved for judgment as a matter of law under the federal civil procedure rule comparable to Florida's civil procedure rule for judgment notwithstanding the verdict. *Id.* The county argued it could not be held liable based on the improper motives of only one commissioner. *Id.* The trial court denied the county's motion. *Id.*

On the county's appeal, the Eleventh Circuit reversed the trial court's denial of the county's motion for judgment as a matter of law. *Id.* According to the Eleventh Circuit, the jury's finding that only one commissioner had acted with an unconstitutional motive did not settle the question of the county's liability. *Id.* Rather, the Eleventh Circuit concluded:

> Because policymaking authority rests with the Commission as an entity, the County can be subject to liability only if the Commission itself acted with an unconstitutional motive. *An unconstitutional motive on the part of one member of a three-member majority is insufficient to impute an unconstitutional motive to the Commission as a whole.*
>
> ....
>
> [T]hat [one commissioner] … may have affected [the other two commissioners'] votes by his influence is not enough to show that they ratified the unlawful basis by also voting for the [reduction of county positions]. In reaching this

9

conclusion, we draw not only upon our precedent, but also upon our belief that a contrary rule would put lawmakers in an unacceptable position. Lawmakers' support for legislation can come from a variety of sources; one commissioner may support a particular piece of legislation for a blatantly unconstitutional reason, while another may support the same legislation for perfectly legitimate reasons. A well-intentioned lawmaker who votes for the legislation—even when [that lawmaker] votes in the knowledge that others are voting for it for an unconstitutional reason and even when [that lawmaker's] unconstitutionally motivated colleague influences [that lawmaker's] vote—does not automatically ratify or endorse the unconstitutional motive. If we adopt the rule suggested by Plaintiff, the well-intentioned lawmaker in this hypothetical would be forced either to vote against [their] own view of what is best for [the] county or to subject [the] county to Section 1983 liability. We think the law compels no such outcome.

*Id.* at 1297-98 (emphases added). In a footnote, the Eleventh Circuit added, "We think this proposition is true even where—as Plaintiff argues is the case here—the properly motivated lawmaker has often voted the same way as the improperly motivated lawmaker." *Id.* at 1298 n.2.

So too here. The city can be subject to whistleblower retaliation liability only if the employee had presented competent substantial evidence at trial that Commissioners Lazarow and Lima-Taub, like Vice Mayor London, may have acted with retaliatory motives in voting to suspend and terminate the employee. The employee did not present any such evidence. And the fact that Vice Mayor London's presentation—whether incomplete, slanted, false, or all of those—may have influenced Commissioners Lazarow and Lima-Taub, or that the three of them tended to vote as a majority bloc, does not change the result. Without evidence that Commissioners Lazarow's and Lima-Taub's non-retaliatory reasons were unworthy of belief, we cannot presume Commissioner Lazarow or Lima-Taub shared Vice Mayor London's alleged retaliatory motives.

The added fact that Commissioner Lima-Taub had not been aware of the employee's 2015 statements to the investigators at the time of her November and December 2016 votes to suspend and terminate the employee makes the lack of shared retaliatory motives even more compelling. *Cf. Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1244-45 (11th Cir. 2016) (holding the trial court properly granted summary judgment on the plaintiff's action under Title VII of the 1964 Civil Rights

Act for retaliation against a school board, where "[w]ithout any knowledge amongst the Board that [the plaintiff had] engaged in protected activity, [the plaintiff] cannot show that the activity caused the adverse renewal vote [on the plaintiff's contract]").

Even if the equal standing of Vice Mayor London and Commissioners Lazarow and Lima-Taub somehow had permitted the "cat's paw" theory's application as a means to establish liability in the instant case, the undisputed facts here preclude such liability. That preclusion is demonstrated by *Whitfield v. City of Hallandale Beach, Florida*, 2021 WL 4987938 (S.D. Fla. 2021), which coincidentally was the ultimate legal action arising from the city attorney's internal racial discrimination complaint discussed earlier in this opinion.

In *Whitfield*, in the months after the investigators had delivered their February 2016 report stating they had been unable to conclude then-Commissioner London had racially discriminated against the city attorney, Commissioner London moved to terminate the city attorney. *Id.* at *1. Then, at the same November 2016 meeting at which the city commission voted 3-2 to suspend the employee in the instant case, the same 3-2 majority voted to terminate the city attorney "with cause." *Id.*

The city attorney filed a multi-claim action against the city, including a Title VII retaliation claim. *Id.* After the action was removed to federal court, the city filed a summary judgment motion directed to the Title VII retaliation claim. *Id.* In response, the city attorney attempted to rely upon a "cat's paw" theory, arguing Vice Mayor London's and Commissioner Lazarow's votes had influenced Commissioner Lima-Taub's vote, such that Commissioner Lima-Taub had been a "cat's paw." *Id.* at *3.

The federal district court rejected the city attorney's argument and granted the city's summary judgment motion. *Id.* at *3-5.

In reaching its decision, the federal district court acknowledged that under a "cat's paw" theory, "the animus of a *non-decision-making employee* can be imputed to a neutral decisionmaker, if that decisionmaker did not conduct an independent investigation. In [such a] case, the *non-decision-making employee* is using the neutral decisionmaker as a 'mere conduit' or 'rubber stamp.'" *Id.* at *3 n.2 (emphases added; citations omitted).

However, despite acknowledging a "cat's paw" theory requires the "animus of a non-decision-making employee" to exist—which did not exist because Vice Mayor London and Commissioners Lazarow and Lima-Taub were all equal decisionmakers—the trial court nevertheless considered

11

whether Commissioner Lima-Taub had acted as a "cat's paw" in the city commission's vote to terminate the city attorney. The federal district court found the undisputed evidence showed Commissioner Lima-Taub had not acted as a "cat's paw":

> [T]he undisputed evidence demonstrates that [Commissioner] [Lima-]Taub voted to terminate [the city attorney's] employment after listening to the reasons articulated on the record and after listening to the entire discussion that took place between [Vice Mayor] London, [Commissioner] Lazarow, and [Mayor] Cooper, and [the city attorney] on the dias [sic], refuting [the city's attorney's] argument that [Commissioner] [Lima-]Taub was a "cat's paw."
> ...
>
> ....
>
> [T]he undisputed record evidence shows that [Commissioner] [Lima-]Taub was not aware of [the city attorney's] February 2015 complaint against [then-Commissioner] London when [Commissioner Lima-Taub] voted to terminate [the city attorney's] employment on November 29, 2016. Accordingly, [the city attorney's] retaliation claim fails for lack of the requisite causal nexus because decision-maker [Lima-]Taub was not aware of [the city attorney's] protected conduct. Moreover, where, as here, not every Commissioner who [had] voted to terminate [the city attorney's] employment had knowledge of [the city attorney's] complaint against London, a retaliatory motive cannot be attributed to the decision.

*Id.* at *3 (footnote omitted).

So too here, merely by substituting the employee in the instant case for the city attorney in *Whitfield*. Here, the undisputed evidence demonstrates Commissioners Lazarow and Lima-Taub voted to suspend and terminate the employee after listening to Vice Mayor London's reasons for such suspension and termination, refuting the employee's argument that either Commissioner Lazarow or Lima-Taub had merely been a "cat's paw." Further, the undisputed record evidence shows that Commissioner Lima-Taub was not aware of the employee's statements to the investigators in 2015 when Commissioner Lima-Taub voted to suspend and terminate the employee in November and December 2016. Accordingly, the employee's whistleblower retaliation claim fails.

12

## *Conclusion*

Based on the foregoing, we conclude the circuit court erroneously denied the city's directed verdict motion as to the employee's whistleblower retaliation claim. Thus, we reverse the final judgment on the whistleblower retaliation claim.

On the employee's breach of contract claim, we conclude the jury's verdict and damages award were supported by competent, substantial evidence. The city's other arguments directed to the employee's breach of contract claim lack merit. Thus, we affirm without further discussion the final judgment in the employee's favor on his breach of contract claim.

Our conclusion moots the city's remaining arguments directed to the employee's whistleblower retaliation claim. Our conclusion also moots the argument upon which the amicus filed its brief in support of the city, being directed solely to the issue of whether the Florida Public Whistle-blower's Act, section 112.3187, Florida Statutes (2016), authorizes non-economic compensatory damages. As we have not reached those arguments, we provide no comment on those arguments.

On remand, the circuit court shall enter an amended final judgment indicating that, on the employee's whistleblower retaliation claim, judgment is entered in the city's favor and the employee shall go hence without day. The amended final judgment also shall maintain that, on the employee's breach of contract claim, judgment is entered in the employee's favor and against the city for the damages awarded on that claim.

*Affirmed in part, reversed in part, and remanded with instructions.*

DAMOORGIAN, J., concurs.
CIKLIN, J., concurs in part and dissents in part with opinion.

CIKLIN, J., concurring in part and dissenting in part.

I concur in the affirmance of the final judgment in the employee's favor on his breach of contract claim. However, I dissent insofar as the majority reverses the final judgment on the whistleblower retaliation claim. My disagreement with the majority on this decision may be largely summed up within two reasons: (1) the city and now the majority rely on distinguishable case law involving claims under 42 U.S.C. § 1983, and (2) *Whitfield v. City of Hallandale Beach, Florida*, 2021 WL 4987938 (S.D. Fla. 2021), does not foreclose application of cat's paw liability in this case or in cases involving municipal decision-making bodies in general.

13

**Claims under § 1983 vs. Florida's Whistle-blower's Act/Title VII**

The applicability or inapplicability of the cat's paw theory of liability to the facts at hand is not nearly as well settled as the majority portrays it. For its conclusion that cat's paw does not apply in this context, i.e., a cause of action under Florida's Whistle-blower's Act involving a municipal decision-making body, the majority relies on the general description of the typical application of cat's paw liability in the employment law context from *State v. Bracewell*, 220 So. 3d 1228 (Fla. 1st DCA 2017).

But *Bracewell* did not involve the issue presented here, whether one member of a decision-making body can act as the monkey in the cat's paw scenario. Thus, the *Bracewell* court did not consider that issue. Instead, the critical issue in *Bracewell* was whether an employee with retaliatory intent was empowered to make recommendations that could ultimately result in the government agency's vicarious liability based on its blind adoption of the employee's recommendation. *Bracewell*, 220 So. 3d at 1234.

Additionally, if we are going to rely on general descriptions of the cat's paw theory of liability, the United States Supreme Court has described cat's paw liability in a way that could arguably encompass the scenario involved here, a commissioner whose lone vote is not sufficient to act but whose vote as a member of a majority constitutes an "ultimate employment decision." *See Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011) (describing a "'cat's paw' case" as one where the employee seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision" (citing *Staub v. Proctor Hosp.*, 560 F.3d 647, 655-56 (7th Cir. 2009))).

Going beyond these general descriptions, the applicability of cat's paw liability has evolved over time, extending to scenarios once considered novel. *See Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 378-79 (6th Cir. 2017) (holding that plaintiff could assert a theory of cat's paw liability where lower level employees influenced an intermediate decisionmaker, who in turn influenced the ultimate decisionmaker); *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 273-76 (2d Cir. 2016) (holding "in the first instance" that "an employer may be held liable for an employee's animus under a 'cat's paw' theory, regardless of the employee's role within the organization," where the employer's negligence gives effect to the employee's animus and results in an adverse employment action); *see also Bracewell*, 220 So. 3d at 1232 ("The issue of which biased employees may subject their employer to cat's paw liability has been percolating in the

14

lower federal courts since [*Staub*] with no definitive consensus emerging.”). As the Tenth Circuit warned, the cat's paw metaphor should not be taken too literally:

> Stripped of their metaphors, subordinate bias claims simply recognize that many companies separate the decisionmaking function from the investigation and reporting functions, and that racial bias can taint any of those functions. We see no reason to limit subordinate bias liability to situations that closely resemble the "cat's paw," "rubber stamp," "conduit," "vehicle," or other metaphors that imaginative lawyers and judges have developed to describe such claims.

*E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 488 (10th Cir. 2006).

My friends in the majority cite two cases relied on by the city for their holdings that municipal liability does not exist unless all members of a municipal body who voted against plaintiff in an employment determination shared the retaliatory animus: *Matthews v. Columbia County*, 294 F. 3d 1294 (11th Cir. 2002), and *Mason v. Village of El Portal*, 240 F. 3d 1337 (11th Cir. 2001).[1] However, *Mason* and *Matthews* involve section 1983 claims and contain no recognition or discussion of cat's paw liability. It is not at all evident the plaintiffs in those cases sought to prove causation under a cat's paw liability theory. If they had, perhaps the Eleventh Circuit would have found cat's paw inapplicable as a matter of law in a section 1983 action. *See Waters v. City of Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 2009) (explaining that cat's paw liability "is steeped in agency principles which are applied in the Title VII context . . . but don't apply to § 1983 municipal liability"); *Kibardina v. Bd. of Tr. of Cmty. Coll. Dist.*, 508, No. 14 C 1351, 2015 WL 327356, at *3 (N.D. Ill. Jan. 23, 2015) (reading *Waters* as suggesting that cat's paw liability does not apply to municipal employers under section 1983).

By contrast, "Florida applies federal Title VII case law to the Whistleblower Act," *Rustowicz v. N. Broward Hosp. Dist.*, 174 So. 3d 414,

---

[1] The majority also cites *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016), but *Quigg* merely recognizes that to establish causation in a Title VII retaliation claim, a plaintiff must show the decisionmakers were aware of the protected activity. *Id.* at 1245. *Quigg* does not address the alternative causation theory of cat's paw and its application or nonapplication.

419 (Fla. 4th DCA 2015), and cat's paw theory "is steeped in agency principles which are applied in the Title VII context," *Waters*, 580 F.3d at 586 n.2. Thus, arguably, Title VII cases are more persuasive in the context of the whistleblower retaliation claim at hand. Indeed, federal courts have found cat's paw available in the context of Title VII claims.[2] And this court itself has recognized that a plaintiff in a whistleblower case may attempt to establish causation through a cat's paw theory. *See Fla. Dep't of Child. & Fams. v. Shapiro*, 68 So. 3d 298, 306 (Fla. 4th DCA 2011). As the majority does not acknowledge, the city has not cited any Title VII case holding that, as a matter of law, a municipality may not be found vicariously liable under a cat's paw theory of liability.

Because courts have recognized the applicability of cat's paw liability in Title VII cases brought against municipalities, *see Zamora*, 798 F.3d at 332, and *Stimpson*, 186 F.3d at 1332, it seems the real issue presented here is whether cat's paw is a proper fit in a whistleblower or Title VII case where the actor with animus is *also one of the decisionmakers*.

Notably, courts have turned to the rationales underlying the theory of cat's paw liability when considering the issue of a novel application of this theory of liability. *See, e.g., Marshall*, 854 F.3d at 378 (discussing the rationale underlying cat's paw liability and determining that the agency principles that support its application to other types of claims also apply to claims of discrimination under the Family Medical Leave Act); *Vasquez*, 835 F.3d at 273 (recognizing that "Congress has directed federal courts to interpret Title VII based on agency principles," and turning to those principles for guidance in determining under what circumstances cat's paw liability "will render an employer responsible for the animus of a low-level employee who works alongside the victim" (citation omitted)).

---

[2] *See Zamora v. City of Houston*, 798 F.3d 326, 332 (5th Cir. 2015) (joining the 6th, 8th, and 10th circuits in holding that cat's paw may be applied in Title VII cases even under the more stringent "but for" causation standard of *Nassar*); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) (recognizing cat's paw is "[o]ne way of proving" causation in a Title VII case); *Whitfield*, 2021 WL 4987938, at *3 (finding the undisputed evidence refuted Whitfield's cat's paw theory with respect to her Title VII retaliation claim); *Burlington v. News Corp.*, 55 F. Supp. 3d 723, 733 (E.D. Penn. 2014) (observing though *Staub*'s analysis of cat's paw is within the context of USERRA, it applies to Title VII cases as well, and citing cases where courts have concluded that *Staub*'s cat's paw analysis applies to Title VII cases).

Missing from the city's brief is any discussion of whether the rationales underlying cat's paw liability render the theory inapplicable to the circumstances here.

Additionally, some case law suggests that cat's paw liability can feasibly be applied to a scenario where a member of a body of decisionmakers influenced his fellow decisionmakers. *See Walsh v. Town of Millinocket*, 28 A.3d 610, 617 (Me. 2011) (opining that the *Matthews* "approach appears to not fully appreciate the decision-making dynamics of local councils and commissions, which can be influenced by the improper but unstated views of a member with a particular interest in a matter to whom other members may defer in collegial discussions," and observing that the opinion appears to be inconsistent with *Staub* as to the application of cat's paw liability); *see also Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 590 n.2 (6th Cir. 2022) (Nalbandian, J., dissenting) (explaining that it is "not unheard of" for courts to apply the cat's paw theory to "multiple decisionmakers" when they "choose to put their collective heads in the sand" and rely on discriminatory information supplied by the biased supervisor/member, citing multiple examples).

Perhaps hidden in the jurisprudence on this issue is a meritorious argument to be made warranting reversal, but the city has missed the mark by relying on § 1983 cases that do not discuss cat's paw liability and without providing any briefing on the propriety of extending those holdings to Title VII/whistleblower claims where the plaintiff advances a cat's paw theory of liability.

### *Whitfield* Does Not Preclude Application of Cat's Paw

The majority and the city also rely on *Whitfield*, but I read *Whitfield*, which involved claims under Title VII, § 1983, and FRCA, as, at a minimum, *leaving open the application of cat's paw in this context*. The district court clearly states, "the undisputed evidence demonstrates that Taub voted to terminate Whitfield's employment after listening to the reasons articulated on the record and after listening to the entire discussion that took place between London, Lazarow, and Cooper, and Whitfield on the [dais], *refuting Plaintiff's argument that Taub was a 'cat's paw.'*" *Whitfield*, 2021 WL 4987938, at *3 (emphasis added). This sentence obviously suggests that the court considered a cat's paw theory on the merits but then rejected it due to lack of evidence.

Additionally, although the *Whitfield* suit arose out of some of the circumstances that resulted in the employee's termination here, it is a completely different suit, involving completely different protected activity

17

and a completely different final termination hearing, and presumably at least some different evidence.

**Conclusion**

I appreciate the compelling policy considerations spelled out in *Matthews*, 294 F.3d at 1297-98, and quoted by the majority, and I do not seek to discount those considerations. But the fact simply remains that the city has not demonstrated that a cat's paw theory of causation cannot apply to a whistleblower retaliation claim involving a municipal body of decision-makers. That is, the city has not made its case. For that reason, reversal on this argument is not warranted. *See Applegate v. Barnett Bank of Tallahassee*, 377 So. 2d 1150, 1152 (Fla. 1979) ("In appellate proceedings[,] the decision of a trial court has the presumption of correctness and the burden is on the appellant to demonstrate error."); *Snowden v. Wells Fargo Bank*, 172 So. 3d 506, 507 (Fla. 1st DCA 2015) (recognizing that even under a de novo standard of review, the appellant has the burden of demonstrating error).

In the end, the evidence, taken, as we are required to do—*in the light most favorable to the employee*—demonstrated that Commissioner London orchestrated a retaliatory campaign against the employee and that the other commissioners in the majority blindly followed. The three commissioners voting in the majority had a previous working relationship: Commissioner London had served as campaign manager for both Commissioners Lima-Taub and Lazarow. Commissioner Lima-Taub admitted, at a commission meeting which occurred after the employee had been terminated, that she "entirely adopted" Commissioner London's misleading representation of the case. She also testified Commissioner London had omitted key information regarding the employee's alleged misconduct in relation to his use of an employee credit card, which omission resulted in her deeming the employee's conduct as "theft." Commissioner Lazarow testified Commissioner London had not disclosed that the employee's allegedly questionable use of his employee credit card had occurred when the employee was the deputy city manager. Commissioner Lazarow acknowledged the city does not discipline deputy city managers.

Other city employees testified that the city did not follow protocol responding to the employee's public records request, which resulted in the employee receiving the requested records after his hearing was held. According to the former deputy and interim city manager, who was involved in collecting the requested records, the records were ready for release several days before the final hearing. Under normal protocol, the

18

records would be reviewed by city staff trained in responding to public records requests. However, she was directed by the city's special counsel in the whistleblower case to submit the records to special counsel for review after city staff had conducted its review. Some of the records would have refuted Commissioner London's claims. But the records were not released to the employee until January 6, days after the public hearing. In contrast, when Commissioner London made a public records request in November 2016, he indicated the records should be available the same day.

The jury considered this evidence and made credibility determinations that did not favor the city's theory of the case. I would not reverse under these circumstances, based on the city's reliance on cases that do not address the issue raised here in the context of a whistleblower retaliation or Title VII claim, and where the city did not make it apparent that the rationales underlying cat's paw liability preclude its application here. Perhaps cat's paw liability has no place in a case like this one, but that has not been made apparent by the city's briefing, and "[i]t is not this court's role to rebrief an appeal." *See Davis v. Sheridan Healthcare, Inc.*, 281 So. 3d 1259, 1274 (Fla. 2d DCA 2019) (Black, J., dissenting). Accordingly, I dissent with respect to reversal of the judgment on the whistleblower claim.

* * *

***Not final until disposition of timely filed motion for rehearing.***